2024 UT App 29

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
NAWAF RAHEEM,
Appellant.

Opinion
No. 20200720-CA
Filed March 7, 2024

Third District Court, Salt Lake Department
The Honorable James T. Blanch
No. 151910845

Freyja Johnson, Emily Adams, and Hannah
Leavitt-Howell, Attorneys for Appellant

Sean D. Reyes and Marian Decker,
Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN D. TENNEY concurred.

ORME, Judge:

¶1 Nawaf Raheem challenges his conviction for aggravated sexual assault on several grounds. He contends that the State provided insufficient evidence at trial to support the mens rea element of the crime. He also argues that his trial attorney (Counsel) was constitutionally ineffective by failing to investigate and call a witness to testify in his defense. Relatedly, he seeks reversal "in the interests of fairness" based on our recent reversal of his co-defendant's conviction on an ineffective assistance of counsel claim. Lastly, he argues that improper statements from the State and inadmissible testimony from its witnesses prevented him from receiving a fair trial. We affirm.

## BACKGROUND[1]

¶2    One night in October 2012, Shannon[2] and a coworker (Coworker) visited a hookah lounge that they frequented. The hookah lounge was "a big party place" at which people would smoke hookah, listen to music, and dance. There, Shannon and Coworker were joined by another friend (Friend) and Shannon's then-boyfriend. Raheem, the owner of the hookah lounge, and Kevin Salazar, a regular customer, were also there that night. Shannon considered both Raheem and Salazar to be her friends.

¶3    At trial, Shannon testified that Salazar, who looked as if he had been crying, asked her to join him in a storage closet to talk. She stated that he shut the door behind her and began kissing her neck. Shannon told Salazar to stop, that she had a boyfriend, and that she "didn't want to be in there," but he was undeterred.

¶4    Because it had been "a minute," Friend went to look for Shannon. She knocked on the storage closet door and tried to enter, but the door was locked. Raheem, who had also been standing outside the storage closet, then knocked on the door. Salazar opened the door for him, and Raheem "slid" inside. One of the men locked the door behind Raheem, leaving Friend outside and unable to enter. Friend testified that she then "just started banging on the door." At one point after Raheem entered, Friend heard Shannon say, "Help me."[3]

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Daniels*, 2002 UT 2, ¶ 2, 40 P.3d 611.

2. A pseudonym.

3. Friend initially testified that Raheem was still in the hallway when she heard Shannon say, "Help me." But on

(continued…)

¶5     Shannon testified that when she heard Raheem knock on the door, she thought she "was going to be able to walk out of that room" and that Raheem would "stop the situation." But instead of helping Shannon, Raheem pushed her against Salazar, bent her over, pulled down her pants, and vaginally penetrated her with his penis. At the same time, Salazar removed his pants and inserted his penis into her mouth. Shannon did not "agree[] to what was going on," but she could not recall whether she said anything.

¶6     Shannon next recalled them all being on the ground, with her on top of Salazar and Raheem behind her. Salazar "was having sex vaginally and [Raheem] was anally." She again could not remember whether she said anything at that point. While doing this, the men "high fived" each other and Salazar said, "Double penetration." At some point, they also removed Shannon's bra, leaving her "basically nude."

¶7     When Shannon heard Friend "banging on the door" and "yelling" "something about a key," she began to cry, and Salazar and Raheem stopped assaulting her. Shannon then dressed, ran out of the storage closet, and left the hookah lounge.[4]

¶8     Friend estimated that approximately five minutes had passed between when she began "banging on the door" and when Shannon exited the closet. Friend pursued Shannon, briefly returning to the hookah lounge to retrieve Shannon's purse and keys, and the two left. Friend testified that Shannon "was really distraught," crying and saying, "Help me." In the car, Shannon told Friend what had happened in the storage closet. Shannon

---

cross-examination, Friend clarified that she heard Shannon's cry for help *after* Raheem entered the storage closet.

4. Shannon's boyfriend had already left the hookah lounge at that point.

then dropped Friend off at home and told her that "she was going to go home and call the police."

¶9    Coworker testified that when Shannon returned from the storage closet, "she was hysterical, sobbing," and "barely able to form sentences because she was crying so hard." Shannon told her, "I have to go. I have to get out of here," and, "[W]e have to go. I was raped. These two guys took me into a closet and raped me." Shannon then yelled "at a group of individuals" "something to the effect of, 'I can't believe you did this. I'm going to make you pay.'" Coworker offered to take Shannon to the emergency room, but she declined the offer and "just wanted to go to her car."

¶10    Shannon did not call the police when she arrived home. Instead, she called another friend and told him that she had been raped. The friend reported the rape to the police. A detective met with Shannon that same night, and she told him what had happened at the hookah lounge. The detective testified that during the conversation, Shannon would not look him in the eye and her posture was "slumped, saddened."

¶11    The detective convinced Shannon to go to the hospital that night for an examination. The examination revealed some bruises and abrasions on Shannon's body, as well as injuries to the perineum, below the rectum, and to the rectum. The examining nurse testified at trial that Shannon's examination "stuck out" to her because "it was the worst rectal injury [she had] seen on a patient." But she conceded that it was nonetheless possible for those injuries to be the product of consensual sex. The nurse also testified that, among other things, during the examination, Shannon "stated she felt as though she blacked out during the assault."

¶12    At the time, Shannon did not "want to go forward with the prosecution of the case" because she did not wish to cause stress to her dying father. Given that she and Raheem "were around the same areas, same places," she saw Raheem "a few times" after that night. But because she "didn't want to make a scene," and

because she "wasn't going to move forward with anything," she "acted like nothing happened" on such occasions. On cross-examination, Shannon stated that she did return to the hookah lounge with friends in 2013, but she did not recall seeing Raheem at that time. She also stated she saw Raheem at a party in 2016 and that she came within eight feet of him. Shannon could not remember whether she saw Salazar again after the night of the party.

¶13     In 2015, a year after her father passed away, Shannon was contacted by the producers of a television program that dealt in unresolved crimes. The producers were interested in her case and Shannon agreed to participate in the show. As a result, the police reopened the case.

¶14     With Shannon's cooperation, the State charged Salazar and Raheem each with one count of aggravated sexual assault. Raheem and Salazar, represented by different counsel, were tried jointly in 2019—nearly seven years after the sexual assault in the storage closet. At trial, the State presented testimony from, among others, Shannon, Friend, Coworker, the friend who called the police, the detective who interviewed Shannon on the night of the incident, a detective who interviewed Shannon in 2015, and the examining nurse. That testimony is recounted, in relevant parts, above. Of note, Shannon's testimony contained multiple instances in which she could not remember specifics and had to refresh her memory by reviewing copies of her police interview, the report from the sexual assault exam, and the preliminary hearing transcript. Additionally, as detailed in Part III.A below, certain statements made by the witnesses and by the prosecutors were the subject of objections and a motion for mistrial.

¶15     As part of his defense case, Raheem called his brother and a friend to testify. His brother testified that he was working at the hookah lounge that night and that he eventually went looking for Raheem. He stated that when he knocked on the storage closet door, Raheem stepped out, followed by Shannon. He stated that Shannon smiled at him and that she did not appear to be upset or

to have been crying. He had not heard "any screaming or crying or anybody call for help" before knocking on the door. He testified that Friend then appeared and pulled Shannon by the arm, and the two "start[ed] walking and talking."

¶16    Raheem's friend testified that he was also at the hookah lounge that night and that he saw Salazar and Shannon walk into the storage closet, followed about a minute later by Raheem. He did not hear "any crying, screaming or calls for help" coming from the closet before or after Raheem entered. He stated that approximately five minutes later, he saw Raheem's brother knock on the door and that Raheem, Salazar, and Shannon all exited the closet. To him, Shannon did not appear upset or to have been crying. He testified that Friend, who did appear upset, then approached Shannon and pulled her away.

¶17    During closing argument, Counsel asserted, among other things, that Shannon, Raheem, and Salazar engaged in a consensual threesome in the closet. He argued that Shannon's returning to the hookah lounge in 2013 and coming within eight feet of Raheem at the 2016 party suggested that she had not been sexually assaulted that night. He further asserted that Shannon's testimony was unreliable and that it should be disregarded in its entirety.

¶18    The jury convicted Raheem and Salazar as charged. Subsequently, through new counsel, Raheem filed motions to arrest judgment and for a new trial. In the motion to arrest judgment, he argued, in relevant part, that the State failed to prove that he "at the very least . . . acted recklessly in regard to [Shannon's] consent." And in the motion for a new trial, Raheem argued, among other things, that he was entitled to a new trial because Counsel was ineffective for failing to investigate and call Raheem's then-girlfriend (Girlfriend) to testify as part of the defense and that the State and its witnesses made several impermissible statements throughout trial. The trial court denied both motions.

¶19    Raheem appeals.[5]


ISSUES AND STANDARDS OF REVIEW

¶20    Raheem raises three issues for our consideration. First, he argues that the State failed to prove that he was at least reckless as to Shannon's nonconsent. He raised this argument before the trial court in a motion to arrest judgment.[6] "We review a district court's grant or denial of a motion . . . to arrest judgment for correctness." *State v. Miller*, 2023 UT 3, ¶ 50, 527 P.3d 1087 (quotation simplified). We will "uphold a denial of the motion . . . to arrest judgment based on an insufficiency of the evidence

---

5. Salazar separately appealed. *See State v. Salazar*, 2022 UT App 38, ¶ 30, 509 P.3d 198, *cert. denied*, 525 P.3d 1258 (Utah 2022). We reversed Salazar's conviction and remanded for a new trial. *See id.* ¶ 60; *infra* Part II.B.

6. Citing *State v. Fullerton*, 2018 UT 49, 428 P.3d 1052, the State argues that this sufficiency challenge is unpreserved because it could have been raised at trial. *See id.* ¶ 49 n.15 ("[A]n objection that could have been raised at trial cannot be preserved in a post-trial motion."). In response, Raheem contends that the State's broad interpretation of *Fullerton* "skirt[s] the plain language" of rule 23 of the Utah Rules of Criminal Procedure, which says that "[a]t any time prior to the imposition of sentence, the court upon its own initiative may, or upon motion of a defendant shall, arrest judgment if the facts proved or admitted do not constitute a public offense, or the defendant is mentally ill, or there is other good cause for the arrest of judgment." Raheem further asserts that "*Fullerton* simply asserts that defendants cannot 'preserve issues like prosecutorial misconduct through motions to arrest judgment.'" *See Fullerton*, 2018 UT 49, ¶ 49 n.15. Because we ultimately resolve the merits of this argument in the State's favor, we need not resolve this preservation issue. *See State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415, *cert. denied*, 496 P.3d 718 (Utah 2021).

claim, if some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *Id.* (quotation simplified). *See State v. Stricklan*, 2020 UT 65, ¶ 31, 477 P.3d 1251 ("We reverse the denial of a motion to arrest judgment only if the evidence, viewed in the light most favorable to the verdict, is so inconclusive or so inherently improbable as to an element of the crime that reasonable minds must have entertained a reasonable doubt as to that element.") (quotation simplified).

¶21 Second, Raheem argues that Counsel was ineffective for failing to investigate and present evidence at trial that would have undercut Shannon's credibility. Although Raheem raised this issue in his motion for a new trial, "[t]here is no reason . . . to depart from the standard of review set out in *Strickland* simply because the appeal was preceded by a motion for new trial." *State v. Templin*, 805 P.2d 182, 185–86 (Utah 1990). That is, "ineffective assistance of counsel claims present a mixed question of fact and law." *Id.* at 186 (citing *Strickland v. Washington*, 466 U.S. 668, 698 (1984)). We thus "review a trial court's application of the law to the facts for correctness and, if applicable, we review the court's findings of fact for clear error." *State v. Torres-Orellana*, 2021 UT App 74, ¶ 26, 493 P.3d 711, *cert. granted*, 502 P.3d 268 (Utah 2021). *See State v. Salazar*, 2022 UT App 38, ¶ 31 & n.14, 509 P.3d 198, *cert. denied*, 525 P.3d 1258 (Utah 2022).

¶22 Third, Raheem argues that "[i]mproper statements from the State and inadmissible testimony from its witnesses prevented [him] from receiving a fair trial."[7] He also raised this argument in a motion for a new trial. We "generally review a district court's denial of a motion for a new trial for abuse of discretion, but we

---

7. The State argues that although certain objectionable statements were the subject of unsuccessful motions for mistrial, this argument is also unpreserved because Raheem first raised the "expanded cumulative-prejudice claim in a post-verdict motion." For the same reason discussed above, *see supra* note 6, we do not reach this preservation argument.

review any underlying legal conclusions for correctness." *State v. Centeno*, 2023 UT 22, ¶ 44, 537 P.3d 232.

ANALYSIS

## I. Sufficiency of the Evidence

¶23 To convict Raheem of aggravated sexual assault, the State had to prove not only that Shannon did not consent to the sexual activity that occurred in the storage closet but also that Raheem was, at the very least, reckless as to Shannon's nonconsent. *See* Utah Code Ann. § 76-2-102 (LexisNexis 2017) ("Every offense not involving strict liability shall require a culpable mental state, and when the definition of the offense does not specify a culpable mental state and the offense does not involve strict liability, intent, knowledge, or recklessness shall suffice to establish criminal responsibility."); *id.* § 76-5-405(2)(a) (Supp. 2023) (stating that an element of aggravated sexual assault includes the commission of rape or forcible sodomy);[8] *State v. Barela*, 2015 UT 22, ¶ 26, 349 P.3d 676 ("The crime of rape [or forcible sodomy] requires proof not only that a defendant knowingly, intentionally, or recklessly had sexual intercourse [or engaged in sodomy], but also that he had the requisite mens rea as to the victim's nonconsent.") (quotation simplified). On appeal, Raheem challenges only the sufficiency of the State's evidence of his recklessness as to Shannon's nonconsent.

¶24 A person acts recklessly

> with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial

---

8. Because the applicable provisions of the Utah Code in effect at the relevant time do not differ from those currently in effect in any way material to this appeal, we cite the current version of the code for convenience.

and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

*Id.* § 76-2-103(3) (2017). Thus, the State was required to prove, at the very least, that Raheem "was subjectively aware of but consciously disregarded the risk" of Shannon's nonconsent. *State v. Robinson*, 2003 UT App 1, ¶ 6 n.2, 63 P.3d 105 (quotation simplified). *See State v. Dyer*, 671 P.2d 142, 148 (Utah 1983) (stating that one is reckless when "one perceives a risk and consciously disregards it").

¶25 "Intent can be proven by circumstantial evidence." *State v. Stricklan*, 2020 UT 65, ¶ 105, 477 P.3d 1251 (quotation simplified). Indeed, "unless a confession is made by the defendant concerning intent, or unless the court is somehow able to open the mind of the defendant to examine his motivations, intent is of necessity proven by circumstantial evidence." *Id.* (quotation simplified). And in determining intent, "the factfinder . . . is entitled to draw all reasonable inferences from the facts and from the actions of the defendant." *Id.* (quotation simplified). *See id.* ¶ 106 ("The criminal intent of a party may be inferred from circumstances such as presence, companionship, and conduct before and after the offense.") (quotation simplified). "A jury's inference is reasonable unless it falls to a level of inconsistency or incredibility that no reasonable jury could accept." *State v. Ashcraft*, 2015 UT 5, ¶ 18, 349 P.3d 664 (quotation simplified). Thus, where the evidence supporting an element of a crime is circumstantial, which will almost always be the case for the mens rea element, "we must determine . . . whether the inferences that can be drawn from that evidence have a basis in logic and reasonable human experience sufficient to prove each legal element of the offense beyond a reasonable doubt." *State v. Aziakanou*, 2021 UT 57, ¶ 63, 498 P.3d

391 (quotation simplified). "The issue is not whether some other (innocent) inference might have been reasonable. It is simply whether the inference adopted by the jury was sustainable." *Stricklan*, 2020 UT 65, ¶ 114 (quotation simplified). An inference is not sustainable if it "give[s] rise to only remote or speculative possibilities of guilt." *Aziakanou*, 2021 UT 57, ¶ 63 (quotation simplified).

¶26    In denying Raheem's motion to arrest judgment, the trial court concluded that "there was sufficient evidence at trial for the jury to find [Raheem] at the very least acted recklessly in raping or sodomizing" Shannon. Pointing to Shannon's testimony that she was trying to exit the storage closet at the time Raheem entered, the court stated that "[t]he jury could reasonably have concluded [Raheem] locked the door, creating a circumstance where he could prevent [Shannon] from leaving the room and could overcome her through physical force." The court also pointed to Friend's testimony that she heard Shannon call for help sometime after Raheem entered the storage closet "and the door was not opened for at least five minutes, creating a circumstance where the jury could have believed [Shannon] did not consent through words or conduct." The court also stated that the jury heard testimony from the examining nurse that Shannon told her "she felt as though she blacked out during the assault," which "create[d] a circumstance where the jury could reasonably believe [Raheem] knew [Shannon] was unconscious or unaware the acts were occurring." Finally, the court stated that "it is reasonable for the jury to conclude a person engaging in sexual activity with another person in a small and cramped space would not consent to a third person approaching her from behind, removing her pants, and penetrating her anally with his penis," causing "severe" rectal injuries that "were consistent with nonconsensual sexual acts."

¶27    On appeal, Raheem argues that "[t]he evidence the district court relied on in its analysis does not prove that [he] acted with a criminal mindset about [Shannon's] nonconsent." He then raises several challenges to the court's analysis:

- He asserts that the act of locking the closet door "does not support an inference that [he] was aware of and consciously disregarded a risk that [Shannon] did not consent" because "[i]t is common to lock a door when engaging in consensual sexual activity" and because Shannon did not testify that she took any action that should have alerted Raheem to the fact that she was trying to exit the storage closet.

- He takes issue with the court's suggestion that the jury could infer that he was reckless as to Shannon's nonconsent based on the type and location of sexual activity that occurred because "[i]ndividuals engage in diverse consensual sexual activity."

- He challenges the court's conclusion that the jury could infer recklessness from Friend's testimony that the door was not opened for five minutes after Friend heard Shannon call for help from the inside. He contends that, even crediting Friend's testimony, any such inference "is unsupported speculation" because Shannon testified that the men ceased the sexual intercourse when she started crying and the fact "[t]hat it took five minutes for the three to dress and emerge does not support an inference that [he] continued sex."

- He argues that the court's focus on the injuries the examining nurse documented during the sexual assault examination was improper because those injuries went toward consent rather than recklessness. And he asserts that, in any event, the injuries did not establish nonconsent because the nurse testified that they could have been caused by consensual intercourse.

- He argues that the court's reliance on the examining nurse's testimony that Shannon "stated she felt as though she blacked out during the assault" was inappropriate because "[w]ithout information about timing, evidence

that [Shannon] 'felt as though she blacked out' at some unspecified moment does not support an inference that [he] was aware of and disregarded a risk that she did not consent during the sexual activity." He further argues that the evidence did not support an inference that Shannon visibly lost consciousness.

¶28 In addition to challenging the court's reasons for denying his motion to arrest judgment, Raheem contends that the State presented insufficient evidence in other respects to prove that he was at least reckless as to Shannon's nonconsent.[9] He argues the following points:

- Shannon told Salazar to stop kissing her on the neck and that she "didn't want to be in" the storage closet *before* Raheem entered the closet, and the State presented no evidence that Raheem heard this interaction from the other side of the door.

- Although Shannon testified that she "was trying to get out" when Raheem entered the closet, "she did not testify that she did or said anything at that point" that would have made him aware of that fact.

- After Raheem entered the closet, Shannon "did not testify about any verbal or nonverbal cues that could have made

---

9. Raheem's arguments are limited to addressing the first part of the recklessness definition, i.e., whether he was "aware of but consciously disregard[ed] a substantial and unjustifiable risk that" Shannon did not consent. Utah Code Ann. § 76-2-103(3) (LexisNexis 2017). He does not argue that the risk was not "of such a nature and degree that its disregard constitute[d] a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from [his] standpoint." *Id.*

[him] aware that she did not consent" to the sexual activity that was about to occur.

- Shannon "did not testify to any actions or reactions that would have made [him] aware of a risk that she did not consent" either when he bent her over and had vaginal sex with her or when he had anal sex with her after they were all on the ground. To the contrary, he points to the fact that Shannon testified that both men ended the sexual encounter when she started crying. "Thus," he argues, "when [Shannon] did exhibit a nonverbal cue that she did not consent, the men heeded that cue and stopped."

¶29　But even taking all the above arguments at face value, the jury nonetheless heard sufficient evidence from which it could reasonably infer that Raheem acted recklessly as to Shannon's nonconsent. As an initial matter, Friend testified that Raheem was also present in the hallway when she initially knocked on the locked door and tried to enter the storage closet. After Friend's efforts proved unsuccessful, Raheem knocked, and the door was opened for him. From this testimony, the jury could reasonably infer that Raheem was aware that Friend was concerned about what was transpiring in the storage closet. But Raheem did not hold the door open for Friend to also enter. Instead, he "slid through the door" and one of the men locked it behind him. Shannon testified that as soon as Raheem entered the closet, he pushed her against Salazar, bent her over, pulled down her pants, and began having vaginal sex with her, all while Salazar also inserted his penis into her mouth. This bears none of the usual hallmarks of consensual sex. There was no evidence presented that there had been a prior agreement between the three to have sex in the closet—to the contrary, Shannon testified that before Raheem entered the closet, she told Salazar that his sexual advances were unwelcome and that she wanted to leave. Nor did Raheem ask any questions to ascertain whether Shannon would consent to sexual intercourse. And even in the absence of any indication from Shannon that she did not consent to the sexual activity, there was also no evidence presented that Shannon

suggested to Raheem in any way that she would consent to such action, if taken. For example, Shannon did not voluntarily bend over; instead, Raheem pushed her against Salazar and caused her to bend over. And Raheem—not Shannon—was the one to remove her pants in the absence of any indication that this would meet with Shannon's approval.

¶30　In sum, the State presented evidence that Raheem entered the storage closet after observing a concerned Friend unsuccessfully try to do the same. When the door was opened for him, he "slid" inside and did not permit Friend to enter. Once in the closet, both men began engaging in sexual activity with Shannon—which was initiated without any indication from Shannon suggesting that she was a willing participant. Based on the evidence of these circumstances, coupled with "reasonable human experience," *State v. Aziakanou*, 2021 UT 57, ¶ 63, 498 P.3d 391 (quotation simplified), a jury could reasonably infer that Raheem was, at the very least, "aware of but consciously disregard[ed] a substantial and unjustifiable risk" that Shannon did not consent when he pushed her against Salazar, removed her pants, and began having sexual intercourse with her, Utah Code Ann. § 76-2-103(3) (LexisNexis 2017).

¶31　For the foregoing reasons, we reject Salazar's challenge to his conviction on sufficiency of the evidence grounds.

## II. Ineffective Assistance of Counsel

¶32　Raheem argues that Counsel was constitutionally ineffective for failing to investigate and call Girlfriend to testify in his defense. He makes two arguments related to this claim of ineffective assistance. First, he argues the merits of the claim. Second, he seeks reversal "in the interests of fairness" based on our recent reversal of his co-defendant Salazar's conviction on ineffective assistance grounds. *See State v. Salazar*, 2022 UT App 38, ¶ 60, 509 P.3d 198, *cert. denied*, 525 P.3d 1258 (Utah 2022). We hold that Raheem is not entitled to reversal on either ground.

A.     The Merits

¶33     To prevail on a claim of ineffective assistance of counsel, a criminal defendant must show both that (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Here, because we hold that Raheem has failed to establish that counsel performed deficiently, we need not also address prejudice. *See State v. Hatch*, 2019 UT App 203, ¶ 29, 455 P.3d 1103 ("A defendant's inability to establish either element defeats a claim for ineffective assistance of counsel[.]") (quotation simplified), *cert. denied*, 462 P.3d 801 (Utah 2020).

¶34     To satisfy the deficient performance element, the defendant must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, and show that defense counsel's actions "fell below an objective standard of reasonableness," *id.* at 688. Under this standard, it is insufficient to merely show that counsel erred. *See State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871. Rather, "the ultimate question is always whether, considering all the circumstances, counsel's acts or omissions were objectively unreasonable." *State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350.

¶35     "An attorney has a duty to conduct a reasonable investigation into the facts of his client's case and to make reasonable decisions regarding the proper scope of that investigation." *Honie v. State*, 2014 UT 19, ¶ 36, 342 P.3d 182. "If counsel does not adequately investigate the underlying facts of a case, including the availability of prospective defense witnesses, counsel's performance cannot fall within the wide range of reasonable professional assistance." *State v. Hill*, 2018 UT App 140, ¶ 11, 427 P.3d 1247 (quotation simplified). Defense counsel's "decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. "In evaluating the reasonableness of counsel's

investigation, we consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Honie*, 2014 UT 19, ¶ 37 (quotation simplified). To that end, "inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions." *Strickland*, 466 U.S. at 691. *See id.* ("Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.").

¶36 Raheem first raised his claim that Counsel was ineffective for not investigating or calling Girlfriend to testify in his motion for a new trial. The motion was accompanied by affidavits from himself and Girlfriend.

¶37 In her affidavit, Girlfriend averred that she dated Raheem "on and off" from 2012 to 2013 and that she "spent a lot of time helping [Raheem] run" the hookah lounge as well as a different lounge he later ran. She stated that on the night of the assault, Shannon came up to her and told her that she had given Raheem "head," which Girlfriend understood to mean that Shannon "had performed oral sex on" Raheem. Girlfriend further averred that Shannon "did not seem upset," nor did she tell Girlfriend that Raheem "forced her to perform any sex act." Girlfriend stated that, to the contrary, Shannon's "tone of voice and expression seemed bragging" as if she intended to make Girlfriend jealous. Girlfriend later confronted Raheem about Shannon's claim, resulting in an argument.

¶38 Girlfriend stated that after that night, Shannon continued to frequent the hookah lounge and "act friendly with" Raheem. Girlfriend stated that on another night, she observed on the security cameras Raheem and Shannon have a conversation and hug. Girlfriend said she confronted Raheem about the hug and another argument ensued. Girlfriend stated that Counsel never contacted her but that if he had called her to testify at trial, she

would have testified as recounted above. She stated that when she heard that Raheem "went to jail," she contacted his brother, who put her in touch with Raheem's appellate counsel.

¶39 In his affidavit, Raheem averred that he told Counsel that following the night in question, Shannon not only continued to visit the hookah lounge, as well as the other lounge he later ran, but that she also "continued to be friendly and flirtatious with" him and "apologized . . . multiple times for 'the drama' and asked if [they] could still be friends." At the end of one of these conversations, the two hugged. He also stated that shortly after the episode giving rise to the charge in this case, Girlfriend confronted him, saying that Shannon told her that Shannon "had given [him] head." Raheem stated that Counsel did not ask whether anyone could corroborate these assertions, and he claimed that if Counsel had asked, "I would have told him that" Girlfriend "could confirm these things."[10]

¶40 Counsel's investigation did, however, uncover pictures taken in 2013—a few months after the sexual assault—of Shannon at the hookah lounge with friends and a video taken at the 2016 party at which Shannon was within eight feet of Raheem. Counsel intended to introduce the pictures and stills from the video at trial. The State objected to the admission of the proposed exhibits "based on relevancy, and also being more prejudicial than probative." Counsel responded that he would not use the stills if Shannon acknowledged that she was at the 2016 party and that she felt sufficiently comfortable to come within eight feet of Raheem. But he did intend to introduce the stills if Shannon denied being at the party or testified that she was "off in a corner scared." He also intended to introduce the 2013 pictures if Shannon denied returning to the hookah lounge with friends and having "a good time." The court sustained the State's objection "for now," stating, "We'll see how she testifies." This issue was

---

10. Raheem does not explain why he did not just volunteer this information considering how important he apparently thought it was.

not revisited later at trial because Shannon did, in fact, acknowledge visiting the hookah lounge with friends in 2013 and approaching within eight feet of Raheem at the 2016 party.

¶41 Raheem argues that Counsel's investigation was deficient because he did not follow up when Raheem told him of Shannon's behavior toward him after the night of the assault. Raheem asserts that if Counsel had done so, he "would have discovered that there was in fact a witness who could corroborate [his] story that Shannon had bragged about her sexual encounter with [him] to a third party." He argues that if Counsel had "investigated and presented [Girlfriend's] testimony, he would have been able to further cast doubt on [Shannon's] credibility and refute statements she made about her post-incident conduct."

¶42 We first emphasize the scope of our inquiry. Without question, the best practice would have been for Counsel to follow up by asking whether anyone could corroborate Raheem's assertions. But, as stated above, under a claim of ineffective assistance of counsel, "the ultimate question is always whether, considering all the circumstances, counsel's acts or omissions were objectively unreasonable." *State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984) (stating that the deficient performance element "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"); *State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871 ("Even if an omission is inadvertent and not due to a purposeful strategy, relief is not automatic.") (quotation simplified). Under this standard, we hold that Counsel's omission was not objectively unreasonable under the circumstances of this case.

¶43 As discussed above, Counsel's investigation into Shannon's post-assault behavior produced photographic evidence both that Shannon returned to the hookah lounge a few months after the assault and that she felt comfortable enough to approach within eight feet of Raheem at a party some years later. Although Shannon acknowledged at trial

that she did these things, thus obviating the need for Counsel to seek admission of the photographic evidence, Counsel nonetheless argued during closing argument that this post-assault conduct conflicted with her claim that she had been sexually assaulted that night. Additionally, Counsel called Raheem's brother and friend to counter Shannon's testimony, as well as that of other State witnesses, regarding her behavior at the hookah lounge immediately after she exited the storage closet.

¶44 Having uncovered the photographic evidence and the two defense witnesses, coupled with Raheem's silence during the conversation as to Girlfriend's ability to corroborate his account of his post-assault interactions with Shannon, it was not unreasonable for Counsel to believe that he had sufficiently investigated Shannon's post-assault conduct. Indeed, Counsel's investigation was sufficient to prompt Raheem to discuss Shannon's continued "friendly and flirtatious" behavior, as well as the hug after a conversation in which Shannon apologized for "the drama." And the follow-up question that Raheem faults Counsel for not asking only sought additional information that a person could reasonably be expected to volunteer without further prompting. Thus, after Raheem divulged the information to which Girlfriend would have testified, it was not unreasonable for Counsel to presume that Raheem would also mention that a witness to such events existed, if one did.[11]

¶45 For these reasons, under the circumstances of this case, we cannot say that Counsel's failure to ask the follow-up question

---

11. Although we cannot be sure on this record whether Raheem was the one to direct Counsel's attention to his brother and friend as witnesses to Shannon's conduct immediately after exiting the storage closet, we note that if he was, it would be yet another reason that Counsel's not asking a follow-up question regarding Shannon's alleged later conduct was not unreasonable.

about other potential witnesses was objectively unreasonable. Raheem's claim of ineffective assistance therefore fails.[12]

B.      Interests of Fairness

¶46    Alternatively, Raheem argues that in light of our recent reversal of co-defendant Salazar's conviction on ineffective assistance grounds, *see State v. Salazar*, 2022 UT App 38, ¶ 60, 509 P.3d 198, *cert. denied*, 525 P.3d 1258 (Utah 2022), we should likewise reverse his conviction and grant him a new trial "in the interests of fairness."[13] But because Raheem does not ground this claim on any constitutional provision, statute, rule, or caselaw, we have no basis for reversal and this argument necessarily fails.

¶47    In the other appeal, Salazar argued, in relevant part, that his trial counsel was ineffective for failing to introduce at trial certain Voxer[14] messages Shannon sent Salazar following the

---

12. Because we reject Raheem's claim that Counsel was ineffective for failing to further investigate, we need not address his argument that Counsel was also ineffective for failing to call Girlfriend to testify at trial. Because Counsel was unaware of Girlfriend's existence at the time of trial, he could not have been expected to call her to testify.

13. Because we reversed Salazar's conviction after Raheem submitted his principal brief, Raheem first raised this issue in his reply brief, and we subsequently authorized surreply briefing on this question.

14. "Voxer is an app that allows users to exchange voice, text, photo, and video messages. Its primary service is to deliver voice live—so it can be listened to immediately while also simultaneously recording the message—so it can be listened to later." *State v. Salazar*, 2022 UT App 38, ¶ 21 n.6, 509 P.3d 198 (quotation simplified), *cert. denied*, 525 P.3d 1258 (Utah 2022).

assault.[15] *See id.* ¶¶ 22, 31, 35. At the preliminary hearing, apart from "a few messages" she received "from Salazar in the days immediately after the incident," Shannon "testified that she did not 'hang out with him after the assault' and 'never had any direct contact with Mr. Salazar.'" *Id.* ¶ 12 (quotation simplified). At trial, Shannon "stated that she did not recall having contact or socializing with Salazar after the incident but that she 'was told that I reported something before to the cops, but I don't remember.'" *Id.* ¶ 18. She also stated that "it was 'correct' that 'at the preliminary hearing under oath she said that she would never have had contact with Salazar after the fact.'" *Id.* (quotation simplified). Salazar's trial counsel did not present the Voxer messages at trial to undermine Shannon's credibility.

¶48 Salazar argued that his trial counsel was ineffective because the Voxer "messages would have showed that Shannon lied when she repeatedly and unequivocally testified at the preliminary hearing that she never again contacted Salazar." *Id.*

---

15. Salazar also argued that his trial counsel was ineffective for failing to investigate the Voxer messages. *See id.* ¶ 35 n.15. We declined to address this issue, stating that even if the State was correct that we should presume that Salazar's counsel investigated the Voxer messages, "it does not change our conclusion that [Salazar's counsel] was ineffective for not using them at trial." *Id.* We also noted that based on the trial court's statement that evidence existed that Salazar's counsel possessed the messages at the time of trial but elected not to use them, "we do not conclude that [Salazar's counsel] failed to investigate the existence of the messages, because he actually had the messages, even though it is suggested by Salazar that [his counsel] did not have the technical expertise to access and review them." *Id.* Our analysis thus focused on counsel's decision not to use the messages at trial. *See id.*

Here, conversely, Girlfriend's affidavit stated that when she did come forward, Raheem's brother put her in contact with appellate counsel—thus indicating that Raheem had already been convicted at that point.

¶ 35 (quotation simplified). We held that Salazar's trial counsel performed deficiently in not using the messages at trial because "with Shannon as the State's lead and most critical witness, any reasonable counsel would have presented the Voxer messages to undermine her credibility." *Id.* ¶ 40. *See id.* ¶ 45 (stating that it was "unreasonable for [Salazar's counsel] not to use the Voxer messages to undercut Shannon's already problematic credibility"). We further held that Salazar was prejudiced, stating that based on "Shannon's problematic testimony and the lack of necessarily inculpatory physical evidence, the Voxer messages would have affected the overall evidentiary picture, and the jury may well have found Shannon less credible." *Id.* ¶ 59 (quotation simplified). *See infra* note 19. Accordingly, we reversed Salazar's conviction for aggravated sexual assault on ineffective assistance of counsel grounds and remanded his case for a new trial. *See Salazar*, 2022 UT App 38, ¶ 60.

¶49    Raheem argues, "[T]his Court should recognize that any change in Mr. Salazar's trial would have resulted in a different outcome for [him]. The two men were charged with the same crime and had a single trial. If Mr. Salazar did not receive a fair trial, [Raheem] was also impacted by that lack."[16] But Raheem's argument in briefing is limited to citing a handful of Utah cases referencing "principles of fairness" in other contexts that provide no basis for reversal in this case.

¶50    During oral argument, Raheem pointed to our Supreme Court's recent decision in *In re J.A.L*, 2022 UT 12, 506 P.3d 606, in

---

16. Raheem primarily argued that reversal was warranted under the law of the case doctrine, contending that "[t]his Court's reasoning in *Salazar* explicitly demonstrates that [Counsel] acted deficiently when he failed to introduce evidence which undercut Shannon's credibility and that [he] was prejudiced by [Counsel's] deficiencies." But Raheem conceded during oral argument that because "different evidence [is] involved" here than was at issue in that appeal, *Salazar* has more of a persuasive effect on the current case "than strict law of the case."

which the Court held, as a matter of first impression, that a mother whose parental rights were terminated could participate in a remand the father had secured on appeal. *See id.* ¶ 34. In that case, each parent raised separate claims of error in the joint appeal, *see id.* ¶ 8, but only the father's claims of error proved successful, *see id.* ¶ 27. Although the mother had not made the same winning arguments, *see id.* ¶ 29, the Court held that "[t]he rights and interests of the parents and the children are not only substantial but intertwined" in the parental termination proceeding, and the juvenile court's missteps that the father had identified on appeal "may bear significant consequences not just for the parents but for their children," *id.* ¶ 33. Accordingly, the Court held "that the mother's briefing decisions should not foreclose her from participating in the case on remand" and that "[b]oth parents' legal rights should be on the table." *Id.* ¶ 34.

¶51   *In re J.A.L.*'s narrow holding is inapplicable to the current case. As the Court's analysis makes clear, the unique context of parental rights termination in which the primary focus is the best interest of the child played a crucial role in that case. Here, no such third-party interest is at stake. Additionally, it was not the error of the court that warranted reversal in *Salazar* but the ineffective assistance of Salazar's trial counsel—and not Raheem's.[17] For

---

17. To be sure, if the trial court, the State, or some other actor had made an error affecting the rights of both co-defendants and resulting in an unfair trial, Raheem may potentially have been entitled to raise that claim of error in his own appeal. In such a situation, the law of the case doctrine may well apply to ensure the same result in both appeals. *See State v. Ellis*, 969 P.2d 1053, 1054 (Utah Ct. App. 1998) (holding that because the appellant's co-defendant received reversal on the "identical facts and legal question" the appellant raised, the law of the case doctrine applied, likewise entitling the appellant to a reversal). But here, as Raheem acknowledged during oral argument, *see supra* note 16, although there are some similarities, the underlying facts and claim of ineffective assistance he raises are distinct from the facts and claim of ineffective assistance that merited reversal in *Salazar*.

these reasons, *In re J.A.L.* does not mandate reversal of Raheem's conviction.

¶52   In sum, because Raheem's fairness argument has no basis in law, it necessarily fails. The reversal of Salazar's conviction in a prior appeal has no binding effect on Raheem's case.

### III. Improper Statements and Hearsay

¶53   Raheem argues that the trial court erred in denying his motion for a new trial in which he claimed that improper statements by the prosecutors and inadmissible hearsay statements by the State's witnesses deprived him of a fair trial. We first recount each of the challenged statements and then proceed to address the merits of Raheem's argument.

#### A.   Additional Facts

¶54   First, during jury selection, the two prosecutors in the case introduced themselves to the potential jurors as members of a "special victims team" and a "special victims unit." Shortly afterwards, during a sidebar conversation, the defense objected to the prosecutors' use of the word "victim" and asked the trial court to either "[c]raft some sort of limiting instruction, or grant . . . a mistrial." The court told the jury that the prosecutors' "use of the word victim is not proper" because "[i]t is inconsistent with the presumption of innocence" and instructed the jury "not to consider the use of that word."

¶55   Second, during opening statements, one of the prosecutors told the jury that Raheem ran the hookah lounge "and it had teenage girls, 18-years-old, who would work there without pay, but would receive hookah or tobacco instead of being paid." The defense objected to this statement, arguing that the defense had no prior notice of this "other acts" evidence. *See* Utah R. Evid. 404(b)(2). The trial court then instructed the jury "to disregard references to any sort of issue about whether there were individuals smoking underage in this establishment, or whether

there were any sort of labor violations with respect to individuals working in this establishment without pay."

¶56 Third, at the beginning of Coworker's testimony, the State asked, "What's your understanding of why you're here to testify?" Coworker responded, "I'm here to testify as a witness against two individuals that had raped [Shannon]." The defense objected and moved for a mistrial, arguing the comment impermissibly bolstered Shannon's credibility and was prejudicial. The court asked whether Coworker's expected testimony regarding Shannon's excited utterances after she exited the storage closet would mitigate the prejudice. *See id.* R. 803(2) (exempting from the rule against hearsay "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused"). The defense recognized that the testimony may "correct the mistake" but argued that the cumulative effect of the comment and the prosecutors' prior statements that they were members of a "special victims team" warranted a mistrial. The court took the motion for mistrial under advisement, but in the interim, it instructed the jury to disregard the comment because "the question of whether or not rape occurred in this case is the ultimate issue in the case that you have to decide as the jury" and Coworker's "comment on it is not proper for you to consider." The court then asked whether the members of the jury understood the instruction and whether they believed they could follow it. The jurors indicated in the affirmative. The court then asked any jurors who "doubt[] their ability to follow that instruction and disregard" Coworker's opinion on the matter to raise a hand. None of the jurors raised their hand.

¶57 Fourth, the detective who convinced Shannon to go to the hospital testified that he had been dispatched "for a possible rape." The defense lodged an objection, which the court sustained and instructed the jury to disregard the statement "for the same reason that I gave you the instruction before." Namely, "[i]t's the ultimate issue in the case about whether or not a rape occurred. That's for you to decide, not for this witness or any other specific

witness to say." The court again asked the jurors whether they could "all follow that instruction to disregard [the detective's] answer." All the jurors again indicated in the affirmative. A little later, the detective testified that when he arrived at the hospital, the examining nurse and a "victims advocate" were already there. The defense did not object to the use of the word "victim" at this time.

¶58     Fifth, during cross-examination of Raheem's friend, in the context of asking about who had subpoenaed him, the State asked, "But who [are] you testifying for?" The defense objected. The court sustained the objection and told the jury, "The witness was subpoenaed to testify. He's not testifying for anyone or against anyone. He's just providing his testimony. Does everybody understand that?" The jurors again responded in the affirmative.

¶59     During a recess, the court heard further argument on the mistrial motion.[18] By that point, both Coworker and Friend had testified as to Shannon's excited utterance when she exited the storage closet that she had just been raped. *See supra* ¶¶ 8–9. The defense nonetheless argued that Coworker's comment and the testimony about Shannon's excited utterances "are two different things" because "[i]n the one case she's offering it and asserting it as a fact, in the other she's talking about things . . . that were told to her." The defense also argued that the detective's mention of a "victims advocate," the State's use of the word "victim" during introductions, and Coworker's "rape" comment all "cumulatively add[] up to a mistrial."

¶60     In response, the State asserted that "no one has called [Shannon] a victim," rather the prosecutors' and the detective's use of the word "victim" was in reference to job titles and descriptions. Indeed, the State pointed out that even Counsel at

---

18. At this point, because Raheem's friend had not yet been called to the stand, the objected-to interaction in which the State asked him who he was testifying for was not discussed.

one point referenced a "victim advocate" during a cross-examination. Concerning Coworker's statement, the State argued that it was not solicited and that any potential prejudice was "cured" by admissible testimony of Shannon's excited utterance when she exited the storage closet that she had just been raped and by the court's curative instruction. Additionally, the State argued that the detective did not indicate that a rape had occurred because he said "possible rape."

¶61 The trial court denied the motion for mistrial, largely agreeing with the State's arguments. The court stated that it held off on ruling on the motion when first lodged at the onset of Coworker's testimony because it wanted "to see how the testimony unfolded." The court acknowledged that the State's question that prompted Coworker's objectionable comment "was probably not the best question for the prosecution to ask of a lay witness" and that the comment was "potentially inflammatory." But the court pointed out that the jury heard admissible evidence of Shannon's excited utterance that she had been raped. Additionally, the jury received a curative instruction, and the court "carefully observed the jurors" while giving the instruction and was convinced that they understood the instruction. It therefore held that any prejudice from Coworker's comment was mitigated. The court further held that the detective's reference to a "potential rape" was not prejudicial because it was no secret that the case was "about an alleged rape." And, in any event, the court stated that it "gave careful curative instructions that" it "believe[d] the jury understood."

¶62 Concerning the use of the word "victim," the court first noted that although the State was correct that no one had called Shannon a victim and that the term was used in the context of discussing job titles, this was nonetheless "problematic when they're injected into a proceeding." *See State v. Juarez*, 2021 UT App 53, ¶ 35, 489 P.3d 231 ("[U]se of the term 'victim' usually will be inappropriate when the defendant defends the case on grounds that no crime was committed and, concomitantly, that there is no victim in the case at all."). *Cf. State v. Vallejo*, 2019 UT 38, ¶ 102,

449 P.3d 39 ("We . . . recognize the gravity of referring to witnesses as victims during a trial."). But the court held that in light of the curative instruction it gave during jury selection, which it believed the jury understood, the use of the word "victim" was not prejudicial. *See Juarez*, 2021 UT App 53, ¶ 39 (stating that curative instructions are "a tool that can sometimes, depending upon the context in which the statements were made, mitigate any prejudice caused by the use of the term 'victim'") (quotation simplified). And although the defense did not object immediately after the detective referenced a "victims advocate," the court stated it believed that the jury understood the prior curative instruction likewise applied to that statement.

¶63 Raheem renewed this argument in his motion for a new trial, in which, in addition to the improper statements he raised in his motion for mistrial, he argued that a new trial was warranted due to the State's discussion of "other acts" evidence during opening statements and due to the State's improper question to Raheem's friend during cross-examination. The court denied the motion. Concerning the prosecutors' reference to a "special victims team" and a "special victims unit" during jury selection and to other acts evidence during opening statements, the court explained, "The court gave curative jury instructions for each of these statements, and [it] found the jury was sophisticated, understood the court's instructions, and indicated a willingness to abide by the instructions. Therefore, any error was cured at trial." Similarly, regarding the State's improper question to Raheem's friend, the court stated that it "gave a curative instruction with regard to the State's implication [the friend] was testifying *for* a particular party, and any error with regard to him was rectified" and "was not prejudicial." Lastly, the court stated that "with regard to references to 'victim' and 'rape,' throughout the trial, there were very few and the court gave curative instructions to the jury instructing it to disregard the references. The jury understood the instructions and agreed to disregard the statements."

B.     The Merits

¶64     Raheem argues that "the cumulative effect of the improper testimony should undermine the court's confidence in the outcome" because "the curative instructions were not adequate to mitigate the cumulative prejudice of the many errors." Referencing Shannon's "credibility issues,"[19] he asserts that "the jury was left with much it was instructed to disregard and little it could legitimately rely on to convict." He also contends that "the inadmissible evidence served to unjustifiably bolster the State's case and credibility of [Shannon's] accusation."

¶65     "Because of the advantaged position of the trial judge to determine the impact of events occurring in the courtroom on the total proceedings, an appellate court will find an abuse of discretion only when the trial court is plainly wrong in that the incident so likely influenced the jury that the defendant cannot be said to have had a fair trial." *State v. Maestas*, 2012 UT 46, ¶ 325, 299 P.3d 892 (quotation simplified). Here, we cannot say that the trial court abused its discretion in denying the motion for a new trial.

¶66     As Raheem points out, in holding that the errors were not prejudicial, the court relied heavily on the curative instructions it issued following each objection to the improper statements. "We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that the jury will be

---

19. In *State v. Salazar*, 2022 UT App 38, 509 P.3d 198, *cert. denied*, 525 P.3d 1258 (Utah 2022), we held that "the State's prospects for a conviction primarily rested on [Shannon's] testimony," *id.* ¶ 58, and that her credibility was "problematic" due to "her inability to remember most of the specifics of the assault without the prosecutor's direction and her changing story about the soda," *id.* ¶ 45. *See id.* ¶ 44 (detailing Shannon's memory issues and inconsistent accounts regarding the allegedly spiked soda she said she consumed).

unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant." *State v. Harmon*, 956 P.2d 262, 273 (Utah 1998) (quotation simplified). *See State v. Curtis*, 2013 UT App 287, ¶ 25, 317 P.3d 968 ("Curative instructions are ordinarily presumed on appeal to be effective, absent a substantial and prejudicial underlying error or irregularity.") (quotation simplified), *cert. denied*, 343 P.3d 708 (Utah 2015). *But see Harmon*, 956 P.2d at 273 ("This is not to say that curative instructions are a 'cure-all.' Some errors may be too prejudicial for curative instructions to mitigate their effect, and a new trial may be the only proper remedy.").

¶67 With the exception of the detective's single mention of the "victims advocate," the court "gave a forceful curative instruction at the time [each] error occurred." *See Harmon*, 956 P.2d at 273. The court not only gave the instruction, it explained why the instruction was being given and asked the jurors to indicate whether they understood the instruction and were able to abide by it. Concerning the "victims advocate" reference, the jury had already received the relevant curative instruction only a few minutes earlier when the same detective stated "potential rape," as well as when the State referenced a "special victims team" during jury selection. There was also "nothing to indicate that the jury was unable to follow the court's instruction to disregard the inadmissible evidence that had been inadvertently presented to it." *See id.* To the contrary, the court "found the jury was sophisticated, understood the court's instructions, and indicated a willingness to abide by the instructions." *See Maestas*, 2012 UT 46, ¶ 325 (acknowledging "the advantaged position of the trial judge to determine the impact of events occurring in the courtroom on the total proceedings") (quotation simplified).

¶68 Furthermore, we are not convinced that the cumulative effect of the improper statements was so "substantial and prejudicial" as to undermine the effectiveness of the curative instructions. *Curtis*, 2013 UT App 287, ¶ 25 (quotation simplified). As the trial court noted, the potential prejudice of most of the statements was significantly decreased by other factors. Most

notably, the prejudice of Coworker's improper statement was significantly decreased when she and two other witnesses provided admissible testimony regarding Shannon's allegations of rape immediately after she exited the storage closet. Additionally, the prejudicial impact of the detective's reference to a "potential rape" is questionable, given the use of the qualifying word "potential" and the jury's general understanding that it was tasked with determining whether Raheem and Salazar sexually assaulted Shannon in the storage closet. Such an understanding likewise minimized the prejudicial impact of the State's and the detective's references to "victim," as they never directly called Shannon a "victim" but rather were using the word when providing titles and descriptions of their jobs.

¶69   Additionally, the State's improper comment during opening statement about the potential underage smoking and labor violations at the hookah lounge was rather mild in comparison to the graphic allegations the jury later heard. *See State v. Murphy*, 2019 UT App 64, ¶ 39, 441 P.3d 787 (stating that the victim's improper statement that the "defendant was shot might have stood out more prominently in other trials" but "in the current case the highly graphic and disturbing nature of the evidence presented to the jury over the course of six days . . . overshadowed" the improper statement), *cert. denied*, 466 P.3d 1074 (Utah 2020). Thus, even considered cumulatively and in light of issues with Shannon's credibility, we cannot say that the prejudicial effect of the errors was so great as to rebut the presumption that the jury followed the trial court's curative instructions.

¶70   For these reasons, the trial court did not abuse its discretion when it denied the motion for a new trial.

## CONCLUSION

¶71   The State presented sufficient evidence at trial to prove that Raheem acted, at the very least, recklessly as to Shannon's

nonconsent. Under the circumstances of this case, Counsel was not ineffective for not asking a follow-up question regarding whether anyone could corroborate Raheem's account of Shannon's post-assault behavior toward him. Lastly, the trial court did not abuse its discretion when it denied the motion for a new trial.[20]

¶72    Affirmed.

————————

20. Raheem also argues that the cumulative effect of the three errors he raises on appeal was prejudicial. "A reviewing court will reverse a jury verdict under the cumulative error doctrine only if the cumulative effect of the several errors undermines confidence that a fair trial was had." *State v. Killpack*, 2008 UT 49, ¶ 56, 191 P.3d 17 (quotation simplified). Because there are no errors to accumulate here, this argument necessarily fails. *See State v. Martinez-Castellanos*, 2018 UT 46, ¶ 40, 428 P.3d 1038 (stating that the cumulative error "doctrine will not be applied when claims are found on appeal to not constitute error, or the errors are found to be so minor as to result in no harm") (quotation simplified); *State v. Modes*, 2020 UT App 136, ¶ 12 n.5, 475 P.3d 153 ("Because we conclude that there are no errors to accumulate here, the cumulative error doctrine is inapplicable in this case.") (quotation simplified).