2026 UT App 47

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
MICHAEL LEE ALLEN,
Appellant.

Opinion
No. 20231109-CA
Filed April 2, 2026

Sixth District Court, Richfield Department
The Honorable Marvin D. Bagley
No. 221600084

Wendy M. Brown, Debra M. Nelson, and
Benjamin Miller, Attorneys for Appellant

Derek E. Brown and Natalie M. Edmundson,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES GREGORY K. ORME and DAVID N. MORTENSEN concurred.

HARRIS, Judge:

¶1      A jury convicted Michael Lee Allen of failure to respond to an officer's signal to stop and refusal to submit to a chemical test. He now challenges those convictions, and he does so by alleging ineffective assistance of counsel as well as by raising two preserved claims, one going to each of his two convictions. Regarding the failure to respond count, he asserts that the trial court erred by denying his request for a lesser-included-offense instruction. And regarding the refusal to submit count, he asserts that the court erred by denying his motion to arrest judgment, which was based on an assertion that, given the language contained in the search warrant, the State had not shown that he refused a test after issuance of a warrant "to draw and test" his

blood. For reasons that follow, we find merit in Allen's argument regarding the refusal to submit count, and we therefore vacate Allen's conviction on that charge. We reject Allen's arguments in all other respects, and we therefore affirm his conviction for failure to respond to an officer's signal to stop.

BACKGROUND[1]

¶2      On a clear spring morning in Richfield, Utah, a police officer (Officer) began following a red car driven by Allen. For the first few minutes, Officer proceeded without lights or siren, simply following Allen's vehicle as it made its way through a residential area and made periodic turns onto different streets. Eventually, Officer observed Allen driving 50 miles per hour in a zone where the speed limit was just 25 miles per hour. Even though Allen was about "two blocks ahead" of him at that point, Officer turned on his lights so he could "pull over [Allen's] vehicle and conduct a traffic stop." But Allen continued to drive, and Officer came to believe that Allen "wasn't going to stop," so he eventually turned his siren on and "left [it] on" while continuing to pursue Allen. Soon after Officer initiated his lights and siren, Officer observed Allen run a stop sign at an intersection that is often "used by bikes and pedestrians" and make rolling stops through multiple other intersections.

¶3      For the next minute or two, Allen stayed on paved residential roads within town, but eventually he proceeded under the freeway and into an area where many of the roads were not paved. He then turned onto a dirt road that was in "very poor

---

1. "When reviewing a jury verdict, we examine the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict, and we recite the facts accordingly." *State v. Popp*, 2019 UT App 173, n.1, 453 P.3d 657 (cleaned up). In so doing, "we present conflicting evidence only when necessary to understand issues raised on appeal." *Id.* (cleaned up).

condition[]" with "a bunch of divots" in it. Officer was driving "over 35, 40 miles an hour . . . trying to catch up" with Allen on the dirt road, and this caused Officer's car to "bounc[e] up and down" as he drove. Eventually, Allen left the dirt road and turned onto a paved road leading back into town, and Officer followed, with Allen leading him past not only homes but also parks and unoccupied baseball fields. At one point, Officer used his "intercom system" to try to tell Allen to pull over. Allen then turned his blinker on and appeared "as if he [was] going to pull over," but instead he "just continue[d] to drive." During this part of the pursuit, Allen had slowed down and was now observing the speed limit and obeying traffic laws.

¶4      By this point, Officer had called for backup, and more officers joined the pursuit, but Allen just continued to drive. Eventually, Allen "slowed down" and "rais[ed] his left hand" out of the driver-side window, leading Officer to believe that Allen was about to pull over, but Allen once again "kept driving." Shortly after that, Allen finally stopped his vehicle; the entire pursuit had lasted about eight minutes. Several officers then exited their vehicles, with firearms drawn, and commanded Allen to get out of his car. Allen complied and was arrested.

¶5      After arriving at the police station, Allen made some "voluntary statements" to Officer. Among other things, Allen told Officer that he thought he "had no other option" and that he "wanted more people there to witness" the eventual traffic stop. He also asked, "What if I had stopped and not rolled my window down? Would you have called for backup?" Later, Allen offered Officer his "apologies" and stated that he "fucked up" and that he "didn't mean to upset" Officer. Officer later mentioned to another officer that Allen had said he did not want to stop because he

"didn't trust any" law enforcement officers because they "beat the shit out of" people.[2]

¶6     At the police station, Officer administered various field sobriety tests to Allen, and he came to believe that Allen was under the influence of drugs or alcohol. Based on this belief, Officer asked Allen to submit to a blood draw, but Allen refused. Officer then applied for and obtained a search warrant that authorized him to "obtain a body fluid sample in the form of [b]lood" from Allen, but even after being told there was a warrant authorizing the blood draw, Allen still refused to comply.

¶7     As relevant here, the State eventually charged Allen with two crimes related to this incident: failure to respond to Officer's signal to stop, a third-degree felony, and refusal to submit to a chemical test, a class B misdemeanor. The first count—for failure to respond to Officer's signal—alleged that Allen had violated Utah Code section 41-6a-210 (Section 210), which forbids an "operator" of a vehicle who receives a "signal from a law enforcement officer to bring the vehicle to a stop" from either (a) "operat[ing] the motor vehicle in willful or wanton disregard of the signal so as to interfere with or endanger the operation of any vehicle or person," or (b) "attempt[ing] to flee or elude" the officer. And the second count—for refusal to submit to a chemical test—alleged that Allen, after receiving a warning from Officer and after a court had "issued a warrant to draw and test" his blood, had nevertheless refused to submit to a blood test.

¶8     The case proceeded to trial, where the State presented only two witnesses—Officer and another police officer who had

---

2. The quotations in the last two sentences of this paragraph come from our own review of the police station video recording, which is part of the record submitted to us. The other statements attributed to Allen, set forth earlier in the paragraph, are taken from testimony offered during trial.

previously interacted with Allen. Officer testified to the facts as recited above. During the State's direct examination of Officer, it played the dashcam video taken from Officer's vehicle during the pursuit and arrest. When the video reached the point of officers arresting Allen, the State asked Officer, "[A]t this point, is this a normal traffic stop where you would approach, ask for license, that kind of thing?" Officer responded as follows:

> No. At this point, it's turned into what we call a felony stop. We train on it often. When they've committed a felony in our presence that we're aware of, it turns into we don't know what's going on, so our guns come out at this point with commands.

Allen's attorney (Counsel) lodged no objection to this testimony. The State then played the portion of the video where the officers arrested Allen with firearms drawn.

¶9 During cross-examination of Officer, Counsel wove different theories into his questioning: some questions were aimed at eliciting evidence that Allen hadn't knowingly received a signal to stop, and others were aimed at eliciting evidence that Allen hadn't intentionally attempted to flee or elude officers. Regarding the first theory, Counsel asked Officer, "[A]re you able to tell the jury today when it was that [Allen] either saw or heard you?" Officer responded, "I can't tell you the exact spot, but you can see in the video when he . . . continued to turn away from me, he must have obviously seen me." But Officer acknowledged that he was "not a hundred percent sure" if Allen had seen him at that point. Counsel also emphasized the fact that the lights on Officer's vehicle were not on the top of the vehicle but, instead, were "inside of the vehicle" where "the top of the windshield and the . . . top of the vehicle" met. And in that same vein, Counsel elicited an admission from Officer that, initially, he only "chirped" his siren twice at Allen after first turning his lights on (before later turning his siren on fully). And regarding the second theory,

Counsel questioned Officer about the reason Allen gave for not pulling over immediately—that he "[n]eeded more" cops there because he "didn't trust any of them."

¶10　Before the State presented its final witness, the court discussed jury instructions with the attorneys. Earlier, Allen had filed a written motion asking the court to include a lesser-included-offense instruction offering the jury the option of convicting him of the lesser offense of failing to comply with an officer's order. He argued that the lesser offense was simply "an infraction" and that the relevant statute—Utah Code section 41-6a-209 (Section 209)—"prohibits an individual from willfully failing or willfully refusing to comply with any lawful order or direction of a peace officer." After hearing arguments from both attorneys, the court denied Allen's request, offering its view that the two statutes were not "close enough to be the same elements" and that there was no legislative "intent that [Section 209 and Section 210] be similar" because the scenario that Section 209 seeks to address is not the "same set of circumstances" addressed by Section 210.

¶11　As part of the same conference, the court discussed the verdict form with the attorneys. After some back-and-forth, there was agreement to use a special verdict form that asked the jury to make a specific finding—if it determined that Allen was guilty of violating Section 210—about whether Allen had (a) operated his vehicle so as to interfere with or endanger the operation of any vehicle or person or (b) attempted to flee or elude officers.

¶12　Later, during closing argument, the prosecutor asserted that Allen's behavior was "more than just a Sunday drive" and that it was a "pursuit" and a "chase." The prosecutor highlighted Allen's specific driving behavior, pointing out that Allen had been speeding and had taken multiple turns, both before and after Officer turned on his lights and siren, and that after Officer initiated his lights and siren, Allen had run a stop sign and had

traveled under the freeway, out of town, and onto a dirt road that was in poor condition. The prosecutor emphasized that Allen did not "have to go down the dirt road" and that there was "no reason" for him to have taken that road. In the end, the prosecutor summed things up by arguing that there was "no other reason" for Allen's actions besides an intent to try to "elude" Officer.

¶13    During his closing argument, Counsel asked the jury to focus on whether Allen "knowingly receive[d] th[e] visual or audible signal" required under the law. He also argued that Allen had not been trying to elude officers or endanger others but, instead, had simply wanted to delay his traffic stop "long enough for additional law enforcement officers to show up to where he [felt] safe." And relating to the refusal to submit charge, Counsel asked the jury to "pay close attention" to the instruction regarding what was required under the warrant and refusal statutes. In particular, Counsel emphasized the language of the search warrant and compared it to the language of the statute (as reflected in the jury instruction), saying, "I want you to tell me where in this warrant does it say the State can test his blood? It doesn't say it in there."

¶14    After deliberation, the jury found Allen guilty as charged. And on the first count—failure to respond to Officer's signal to stop—the jury selected both alternative elements on the special verdict form. That is, it found both (a) that Allen had exhibited a "willful or wanton disregard of the signal so as to interfere with or endanger the operation of any vehicle or person" and (b) that Allen had attempted to "flee[] or elud[e] a law enforcement officer by vehicle or other means."

¶15    After trial but before sentencing, Allen filed a motion asking the court to arrest judgment on the refusal to submit count. In his motion, he asserted that under the relevant statute, he could be convicted only if he refused a blood test after a court had issued "a warrant to draw *and test* the blood," *see* Utah Code § 41-6a-

520(7) (2021)[3] (emphasis added), and he pointed out that the search warrant in question authorized the drawing of his blood but said nothing about testing it. In response, the State argued that, although the search warrant did "not specifically" say that Allen's blood was to be tested, such a conclusion was "implicit" in the language and purpose of the warrant.

¶16    The court had not yet acted on Allen's motion to arrest judgment when the parties appeared at the sentencing hearing. During that hearing, neither party mentioned the outstanding motion, and the court made no express ruling on it. Instead, the court moved forward with sentencing, and at the beginning of the hearing it indicated that it had "met with the lawyers in chambers." That meeting in chambers was held off the record, and neither the court nor the attorneys attempted afterward to make a record of anything that had been discussed during that meeting. The court then proceeded to sentence Allen as per the joint recommendation of the State and the defense: on the failure to respond charge, the court sentenced Allen to a prison term of up to five years, but it suspended that sentence. And on the refusal to test charge, the court sentenced Allen to 180 days in jail, but it suspended 150 days of that sentence. Ultimately, the court placed Allen on probation, with conditions, and required Allen to serve thirty days in jail.

ISSUES AND STANDARDS OF REVIEW

¶17    Allen now appeals his convictions, and he asks us to consider three issues. First, with regard to the failure to respond charge, he challenges the trial court's denial of his request for a

—————————

3. This statute was amended and renumbered in 2024. *See* Utah Code § 41-6a-520.1. We cite a previous version of the statute in the text because it was the version in effect at the time of the events in question in this case. Both parties agree that this is the correct version of the statute to apply.

lesser-included-offense instruction. "The refusal to give a requested jury instruction on a claimed lesser included offense is a legal determination, which we review for correctness." *State v. Herrera*, 2021 UT App 46, ¶ 5, 487 P.3d 472 (cleaned up).

¶18    Second, with regard to the refusal to test charge, Allen challenges the court's implicit denial of his motion to arrest judgment. "We review a district court's grant or denial of a motion to arrest judgment for correctness." *State v. Raheem*, 2024 UT App 29, ¶ 20, 546 P.3d 331 (cleaned up).

¶19    Third, Allen claims that Counsel rendered ineffective assistance. "When an ineffective assistance claim is raised for the first time on appeal, it presents a question of law." *State v. Rivera*, 2022 UT App 44, ¶ 21, 509 P.3d 257.

ANALYSIS

I. Lesser-Included-Offense Instruction

¶20    Allen first challenges the trial court's decision to deny his request for a lesser-included-offense instruction on the failure to respond charge. He asserts—correctly—that the court improperly considered the purpose of the statutes when making its determination. And he asserts that he was entitled to the lesser-included-offense instruction because the elements of the two offenses overlap to some degree, and because there was a "rational basis" in the evidence upon which the jury could have acquitted him of the greater offense but convicted him on the lesser. While Allen makes some good points, we ultimately discern no reversible error in the trial court's decision.

¶21    Under Utah law, when a defendant asks for a lesser-included-offense instruction, the court is required to give it if two requirements are met: "(i) the statutory elements of greater and lesser included offenses overlap to some degree, and (ii) the

evidence provides a rational basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense." *State v. Hansen*, 734 P.2d 421, 424 (Utah 1986); *accord State v. Baker*, 671 P.2d 152, 158–59 (Utah 1983). On appeal, the parties agree that the first element is met here because the elements of Section 209 overlap with some of the elements of Section 210. Indeed, this court has already concluded that "disobeying a peace officer can be a lesser included offense of fleeing or eluding a peace officer." *State v. Simpson*, 904 P.2d 709, 712 (Utah Ct. App. 1995).

¶22　Thus, the contested questions we must consider are whether there is a rational basis in the evidence upon which the jury could have acquitted Allen under Section 210 but convicted him under Section 209 and, if so, whether the trial court's decision not to give the Section 209 instruction prejudiced Allen. *See State v. Reece*, 2015 UT 45, ¶ 32, 349 P.3d 712 (holding that "denying a lesser-included-offense instruction is an ordinary trial error to which harmless error analysis applies"). And on this record, we view these two questions as interrelated.

¶23　For purposes of our analysis, we accept as true Allen's assertion that there is a rational basis in the evidence for the jury to have convicted him under Section 209. After all, that section simply prohibits an individual from "willfully fail[ing] or willfully refus[ing] to comply with any lawful order or direction of a peace officer." Utah Code § 41-6a-209(1)(a). There is ample basis in the evidence for conviction on these grounds.

¶24　But it is a much closer call as to whether—on this record— there is a rational basis in the evidence for a jury to have acquitted Allen of the Section 210 charge. That statute forbids an "operator" of a vehicle who receives a "visual or audible signal from a law enforcement officer to bring the vehicle to a stop" from either (a) "operat[ing] the vehicle in willful or wanton disregard of the signal so as to interfere with or endanger the operation of any

vehicle or person" or (b) "attempt[ing] to flee or elude" the officer. *Id.* § 41-6a-210(1)(a) (2021).[4] Allen was clearly an operator of a vehicle. But in order to win a conviction, the State needed to also prove that Allen received a signal to stop and that the requirements of at least one of the two alternative subsections were satisfied. We focus our analysis here on the second (the flee-or-elude) alternative. Thus, the question presented is whether, on this record, there was a rational basis in the evidence for a reasonable factfinder to have entered a judgment of acquittal on two issues: whether Allen received a signal to stop and, if so, whether Allen attempted to flee or elude Officer thereafter.

¶25  In this context, the rational basis requirement is not a particularly high standard to meet. "This standard does not require the court to weigh the credibility of the evidence, a function reserved for the trier of fact." *Baker*, 671 P.2d at 159. Instead, "[t]he court must only decide whether there is a sufficient quantum of evidence presented to justify sending the question to the jury." *Id.* If the evidence is "susceptible to alternative interpretations," then "a jury question exists" on the point. *Id.* Only if no reasonable jury could find for the defendant on the point is there no rational basis in the evidence.

¶26  This is arguably a more lenient standard than the one we apply when assessing harmless error. In making that assessment, we engage in a hypothetical inquiry in which we envision "an alternative universe in which the trial went off without the error," and we ask whether, in that hypothetical counterfactual trial, there is a reasonable likelihood of a different outcome. *See State v. Ellis*, 2018 UT 2, ¶¶ 41–42, 417 P.3d 86; *accord Reece*, 2015 UT 45,

---

4. This statute was also amended in 2024. *See State v. Chacon*, 2026 UT App 22, ¶ 18 n.3 (discussing the terms of the 2024 amendment). In this case, we rely upon the 2021 version of the statute because it was the version in effect at the time of the events in question.

¶ 40; *State v. Leech*, 2020 UT App 116, ¶¶ 42–43, 473 P.3d 218. In this case, this inquiry requires us to envision a hypothetical trial in which the jury was given a lesser-included-offense instruction regarding Section 209, and it requires us to ask whether an acquittal in that trial on the Section 210 charge would have been reasonably likely.

¶27    Here, the State's case against Allen on the Section 210 charge was strong. At trial, the jury heard Officer testify—and watched the accompanying dashcam video—about how Officer pursued Allen with his lights and siren on for roughly eight minutes, with Allen refusing to pull over. The jury also saw that during this pursuit, Allen ran a stop sign at an intersection that is often "used by bikes and pedestrians," and that he made rolling stops through several other intersections. And the jury saw that Allen led Officer under the interstate, out of town, and onto a rutted dirt road that was in very poor condition, leaving Officer driving "over 35, 40 miles an hour . . . trying to catch up." The jury also saw that Allen refused to pull over even after Officer used his "intercom system" to tell Allen to pull over.

¶28    The facts in this case are similar to those in *State v. Simpson*, where this court concluded that the evidence did not support a rational basis for a verdict acquitting the defendant of the greater offense. *See* 904 P.2d 709, 714. (Utah Ct. App. 1995). In that case, the defendant was charged with "eluding a peace officer" after he refused to pull over when officers illuminated their emergency lights. *See id.* at 710–11. After the officers turned on their lights, the defendant "accelerated from about sixty to about eighty-five miles per hour," officers saw him "throw an unidentified object out [of] the window," and while speeding the defendant "weav[ed] somewhat between . . . two lanes" before finally stopping after an eleven-mile pursuit. *Id.* at 710. At trial, the defendant requested a lesser-included-offense instruction under Section 209's predecessor statute. *See id.* at 711. There, our court concluded "that no rational jury could acquit [the defendant] of

fleeing or eluding a peace officer but still find him guilty of disobeying a peace officer" because "[t]he jury simply had no rational basis to conclude that, although [the defendant] *willfully* disregarded the officers' signal to stop his car and immediately increased his speed in response to the officers' signal and failed to pull over for several miles, he was at no time attempting to flee or elude the officers." *Id.* at 713–14.

¶29  Allen argues that *Simpson* is a "factually dissimilar case," but we do not agree. In this case, Officer pursued Allen for roughly eight minutes. Although he may not have been traveling at speeds as high as those at issue in *Simpson*, Allen drove at twice the posted speed limit before Officer initiated his lights, continued to speed after Officer began his pursuit, ran a stop sign and rolled through others, and drove under the freeway onto an unpaved dirt road in very poor condition. Toward the end of the pursuit, Allen may have been obeying traffic laws and observing the speed limit, but he didn't start out that way, and he was still refusing to pull over in response to Officer's lights and sirens—just as the defendant did in *Simpson*. The facts in this case may be somewhat less extreme than in *Simpson*, but in our view the similarities are more significant than the differences.

¶30  Moreover, in attempting to further distance himself from the facts of *Simpson*, Allen asserts that the reason he did not pull over was not because he was intending to flee or elude officers, but because he "[n]eeded more" officers present at the eventual traffic stop for his personal safety. At trial, Counsel argued that Allen had not been trying to elude officers or endanger others but, instead, that he had simply wanted to delay his traffic stop "long enough for additional law enforcement officers to show up to where he [felt] safe." We take Allen's "point that not all motorists who do not immediately pull over upon receipt of an officer's signal intend to flee or elude officers." *State v. Chacon*, 2026 UT App 22, ¶ 20 (describing the defendant's argument that while "his actions were intentional," his "motivation" in deciding not to

immediately pull over "was not to flee or elude the officers but, instead, to simply find somewhere safe to pull over and to get the truck back to its owner"). But here, Allen's assertion that he was not intending to flee or elude Officer—and, instead, was simply trying to get to a place where he felt safe for the traffic stop—is a tough one for a factfinder to credit, given the evidence presented.

¶31   Indeed, the dashcam video is included in the record submitted to us, and we have watched that video ourselves. In short, it is damning. The video clearly shows Allen driving away from Officer at high speed, running a stop sign, rolling through others, and leaving town under the freeway and driving onto a rutted dirt road. After watching that video, it is hard to come to any rational conclusion other than that Allen had indeed received Officer's signal to stop and that he was trying to ditch Officer after receiving the signal.

¶32   On this record, it doesn't matter much whether we conclude that there is at least some rational basis in the evidence upon which a jury could have determined that Allen either didn't receive the signal or that Allen was not attempting to flee or elude Officer. Even if we were to indulge those assumptions in favor of Allen, we are still entirely unable to envision a reasonable possibility, let alone a reasonable likelihood, of a more favorable outcome for Allen in a hypothetical trial in which Allen got his requested Section 209 instruction. *Cf. Reece*, 2015 UT 45, ¶¶ 40–43 (concluding that "even if the trial court had instructed the jury on lesser offenses . . . , there is no reasonable likelihood that the outcome of trial would have been different, and the trial court's failure to issue the instructions was harmless" (cleaned up)).[5]

---

5. During oral argument before this court, Allen pointed to our supreme court's decision in *State v. Baker*, in which the court stated, "Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of *some* offense, the

(continued…)

Given the nature of the dashcam video, the evidence against Allen on the Section 210 charge was so strong that, in all likelihood, he would have been convicted of that charge even in a hypothetical trial in which the court gave a Section 209 instruction.

¶33    For these reasons, and although the trial court's analysis was not exactly right, we see no reversible error in the court's ruling, and on that basis we reject Allen's challenge to the court's decision not to give the lesser-included-offense instruction.

## II. Motion to Arrest Judgment

¶34    Next, Allen challenges the court's implicit ruling denying his motion to arrest judgment on the refusal to submit count. On the merits of the issue, Allen asserts that the court erred when it did not grant his motion because the elements of the refusal to submit statute were "not met as a matter of law." In response, the State contests Allen's position on the merits, but it also makes two threshold-level arguments. First, it asserts that because Allen raised his sufficiency-of-the-evidence challenge for the first time

---

jury is likely to resolve its doubts in favor of conviction." 671 P.2d 152, 157 (Utah 1983) (cleaned up). The court went on to explain that because of this reality, "where proof of an element of the crime is in dispute, the availability of the 'third option'—the choice of conviction of a lesser offense rather than conviction of the greater or acquittal—gives the defendant the benefit of the reasonable doubt standard." *Id.* From *Baker*, Allen infers that the lack of a lesser-included-offense instruction, when warranted, must necessarily be harmful. But *Baker*'s discussion of the practicalities of giving such instructions did not obviate the need for harmless error analysis; indeed, our supreme court post-*Baker* has continued to apply harmless error principles when considering similar issues. *See, e.g.*, *State v. Reece*, 2015 UT 45, ¶¶ 40–43, 349 P.3d 712. We thus reject Allen's implicit argument that *Baker* has installed a structural error regime in this context.

in a post-verdict motion, his claim was not properly preserved. Second, it posits that Allen has not met his burden on appeal because of an inadequate record. For the reasons discussed, we reject both of the State's threshold arguments and proceed to consider the merits of Allen's challenge, where we conclude that the motion to arrest judgment should have been granted.

A.     Preservation

¶35     Regarding preservation, the State argues that because Allen "did not move for a directed verdict on sufficiency grounds or otherwise raise the issue to the trial court during trial," his post-verdict motion to arrest judgment was "insufficient to preserve the issue for appeal." This argument might have traction in other contexts. But where the question raised is whether the State presented sufficient evidence for conviction, a defendant does not act tardily by raising that question for the first time in a post-verdict motion to arrest judgment.

¶36     This issue is controlled by the text of rule 23 of the Utah Rules of Criminal Procedure, which states as follows:

> *At any time prior to the imposition of sentence*, the court upon its own initiative may, or upon motion of a defendant shall, arrest judgment if the facts proved or admitted do not constitute a public offense, or the defendant is mentally ill, or there is other good cause for the arrest of judgment.

(Emphasis added.) "When interpreting a rule of procedure on appeal, it is our duty and practice to adhere to the plain language of a rule," using "our general rules of statutory construction." *Cougar Canyon Loan, LLC v. Cypress Fund, LLC*, 2020 UT 28, ¶ 13, 466 P.3d 171 (cleaned up). The language of rule 23 is clear: a motion to arrest judgment on the basis that "the facts proved . . . do not constitute a public offense" may be made "[a]t any time prior to the imposition of sentence." Utah R. Crim. P. 23. Allen's

motion fits directly within the text of this rule: the basis for his motion was that the State hadn't proved the elements of the charge, and Allen filed the motion prior to imposition of sentence.

¶37 Despite the clarity of the rule's language, the State nevertheless argues that Allen's motion was untimely because he did not bring it (or a similar motion) during the run of trial. In support of its argument, the State directs our attention to caselaw from our supreme court stating that "an objection that could have been raised at trial cannot be preserved in a post-trial motion." *State v. Fullerton*, 2018 UT 49, ¶ 49 n.15, 428 P.3d 1052. In *Fullerton*, the defendant argued that the State had "violated his due process rights" when the prosecutor criticized a witness's memory during "closing arguments instead of raising [the issues] on cross-examination, thereby denying [the defendant] the ability to bring in the witness's prior consistent statements under" the rules of evidence. *Id.* ¶ 48. But in that case, the defendant lodged no real-time objection to the prosecutor's closing argument and thus gave the trial court no opportunity to remedy the matter prior to verdict; instead, the defendant raised the objection for the first time "in a motion for new trial." *Id.* ¶ 49. On those facts, our supreme court concluded that prosecutorial misconduct of this kind needed to be objected to in the moment, during the allegedly offensive arguments, and that objections made later for the first time in a post-trial motion would not be considered preserved for appellate review. *See id.* In support of its holding, our supreme court cited a previous case that also involved a complaint about alleged prosecutorial misconduct during closing argument. *See id.* (citing *State v. Larrabee*, 2013 UT 70, ¶¶ 15–16, 321 P.3d 1136).

¶38 We must attempt to harmonize the text of rule 23 with our supreme court's holdings in *Fullerton* and *Larrabee*, each of which is binding on us. *Cf. Peterson & Simpson v. IHC Health Services, Inc.*, 2009 UT 54, ¶ 13, 217 P.3d 716 ("When interpreting the plain language, we look for a reading that harmonizes the provisions and avoids rendering any provision meaningless." (cleaned up)).

And in our view, the only way to do that is to read *Fullerton* and *Larrabee* as being limited to situations in which the issue complained of is *not* one listed in rule 23. We flagged this issue in a recent case. *See State v. Raheem*, 2024 UT App 29, ¶ 20 n.6, 546 P.3d 331 (declining to resolve the preservation question because we "ultimately resolve[d] the merits of [the] argument in the State's favor"). Here, we reach the issue left open in *Raheem*, and we conclude that, at least where the subject of a post-verdict rule 23 motion is a sufficiency-of-the-evidence argument, that motion is timely if filed prior to imposition of sentence. In our view, the text of rule 23 permits no other conclusion, and therefore our supreme court's caselaw must be read more narrowly than the State suggests. For this reason, Allen's motion to arrest judgment must be considered timely filed, and the issues raised therein must be considered appropriately preserved for appellate review.

## B.    Record

¶39    Next, the State argues that Allen cannot meet his burden of persuasion on appeal regarding the motion to arrest judgment because, in the State's view, the record is inadequate. The State correctly points out that the trial court never made an express ruling on the motion. Allen takes the position that, because the court did not explicitly rule on the motion but later imposed sentence upon him on the refusal to submit count, the court implicitly denied his motion to arrest judgment. In response, the State points to the fact that, right before the court imposed sentence, there was an off-the-record conference in chambers, and the State posits that, during that conference, Allen might have withdrawn his motion or otherwise waived the issue.

¶40    We start with the premise that "[w]hen a final disposition of a case is entered by a district court, any unresolved motions inconsistent with that disposition are deemed resolved by implication." *State v. Mullins*, 2005 UT 43, ¶ 8, 116 P.3d 374. The State does not take issue with this premise and, in the absence of

the mysterious off-the-record chambers conference, it would presumably not take issue with Allen's position that the record supports the notion that the motion was made and implicitly denied and that the court's implied ruling is therefore ripe for appellate review.

¶41    To be sure, the existence of the mysterious unrecorded conference complicates things.[6] There is no objective indication that the motion was discussed at that conference. But the State is not wrong when it suggests that it is at least *possible* that the motion could have been discussed during that conference. And if it was discussed, we of course do not know what the discussion entailed. One theory is that the court and counsel discussed the motion, and the court denied it. Another theory—and the one the State asks us to credit—is that, during that off-the-record conference, Allen might have withdrawn the motion "as part of a sentencing agreement he was reaching with the State." The State notes that the trial prosecutor had "agreed to a more lenient sentence than what the presentence report recommended," and it posits that "[i]t would thus be unsurprising if [C]ounsel decided to withdraw his motion to arrest judgment in order to secure this favorable sentencing agreement from the State."

¶42    But there is no record support for the notion that—during the chambers conference or at any other time—Allen withdrew or otherwise waived his motion to arrest judgment. The State's arguments on this point are mere speculation and conjecture. As

---

6. This scenario presents yet another example of the kinds of problems that can arise when trial courts engage in off-the-record interactions about a case with attorneys or litigants. "[W]e have repeated time and again that all district court proceedings must be recorded." *State v. Burnside*, 2016 UT App 224, ¶ 51, 387 P.3d 570. We reiterate that statement here and again emphasize that this admonition "applies to conferences in chambers and at the bench, not just to more formal proceedings in open court." *Id.*

an initial matter, there is nothing in the record that would indicate that the motion was even discussed or considered during that conference. And there is likewise nothing in the record to indicate that, even if the motion *was* discussed at the conference, it was withdrawn rather than denied. The court was certainly aware of the motion; after all, Allen filed a written motion and the State filed a written response. And the court's ultimate imposition of sentence upon Allen on all counts, including the refusal to submit count, is entirely consistent with denial of that motion. Thus, the surrounding circumstances—to the extent they indicate anything at all regarding the outcome of the motion—indicate an implicit denial of the motion.

¶43    If there were some actual suggestion in the record that the parties had discussed withdrawal of the motion to arrest judgment during the chambers conference, the situation may well be different. But where no such suggestion exists, it is in our view unfair to Allen to indulge the State's speculation. We therefore do not discern any record-inadequacy problem that would prevent us from reviewing the merits of Allen's appellate challenge regarding the motion to arrest judgment.

C.    Merits

¶44    We turn now to the merits of that question. On that point, Allen asserts that his conviction on the refusal to submit charge was not supported by sufficient evidence because the search warrant authorized the State only to draw his blood, and not to "test" it, as required under the relevant statute. In response, the State contends that because the warrant authorized the State to "obtain" Allen's blood, it implicitly authorized the State to "test" his blood as well. We agree with Allen that the statute requires the warrant in question to have authorized both the drawing *and* the testing of his blood, and that because it did not, the State failed to prove the required elements of the refusal to submit charge.

¶45 The exercise here is one of statutory interpretation. In this context, our guiding principle "is to ascertain the intent of the legislature." *In re adoption of B.H.*, 2020 UT 64, ¶ 31, 474 P.3d 981 (cleaned up). Indeed, "the best evidence of legislative intent is the plain language of the statute itself." *State v. Malo*, 2020 UT 42, ¶ 22, 469 P.3d 982 (cleaned up). When the statutory language is unambiguous, we do "not look beyond the same to divine legislative intent" because "we are guided by the rule that a statute should generally be construed according to its plain language." *Id.* (cleaned up); *see also Scott v. Scott*, 2017 UT 66, ¶ 22, 423 P.3d 1275 ("When we can ascertain the intent of the legislature from the statutory terms alone, no other interpretive tools are needed, and our task of statutory construction is typically at an end." (cleaned up)). And when interpreting a statute, "we read the language of the statute as a whole." *State v. Davis*, 2011 UT 57, ¶ 21, 266 P.3d 765 (cleaned up). In doing so, we "assume that each term included in the statute was used advisedly, and we seek to give effect to every word, clause, and sentence if such can be reasonably done." *Id.* (cleaned up).

¶46 The text of the relevant statute requires that the underlying search warrant authorize both the "draw[ing]" and "test[ing]" of the person's blood. It reads as follows:

> A person is guilty of refusing a chemical test if a peace officer has issued the warning required in Subsection (2)(a) and the person refuses to submit to a test of the person's blood under Subsection (1) *after a court has issued a warrant to draw and test the blood*.

Utah Code § 41-6a-520(7) (2021) (emphasis added). While the statute uses the term "test" numerous times in its various subsections, only here does it use the phrase "draw and test." *See id.* § 41-6a-520.

¶47 It is undisputed that the search warrant that officers obtained in this case did not use the phrase "draw and test."

Instead, it authorized officers "to obtain a body fluid sample in the form of [b]lood." Allen relies on the actual text of the warrant, which authorized only the "obtain[ing]" of the blood sample and did not specifically authorize officers to test any sample they might obtain. From this textual premise, Allen asserts that the warrant did not meet the statutory requirement that it authorize both the "draw[ing] and test[ing]" of his blood. *See id.* § 41-6a-520(7). And even apart from the text of the statute, Allen argues in his brief that *obtaining* the blood sample and *testing* the blood sample constitute two distinct searches, each of which must be separately authorized. (Citing *Skinner v. Railway Labor Execs. Ass'n*, 489 U.S. 602, 642, 647 (1989) (Marshall, J., dissenting) (arguing that the drawing of blood and the testing of blood are "distinct searches" because "the chemical analysis . . . perform[ed] upon the blood . . . implicates strong privacy interests apart from those intruded upon by the collection of bodily fluids")).

¶48 In response, the State asserts that when the relevant statute is considered as a whole, "the term 'draw' is part and parcel of 'test.'" It contends that the statute's repeated use of the term "test," in context, indicates that the term is intended to include "both the method of collection" as well as the ultimate act of examining its contents. Therefore, according to the State, the warrant's terms "implied that the collection of the blood was for testing purposes."

¶49 On balance, we think Allen has the better of the argument. While the relevant statute does use the term "test" often, and perhaps even in some of these usages the term was intended to encompass both the collection of the blood as well as the ultimate examination of it, we are unable to get past the fact that, in the subsection setting forth the actual elements of the crime, the statute uses the term "draw and test." *See* Utah Code § 41-6a-520(7) (2021). Our legislature chose to use both "draw" and "test" when setting forth the elements of the relevant crime, and we

presume that "each term included in the statute was used advisedly." *Davis*, 2011 UT 57, ¶ 21 (cleaned up).

¶50     Similarly, we reject the State's assertion that we can imply the "'test' means 'draw and test'" concept into the terms of the search warrant. "A valid warrant authorizes the police to search when and where they otherwise would have no right," because there are constitutional requirements that exist to protect individuals' rights. *State v. Dunn*, 850 P.2d 1201, 1217 (Utah 1993), *abrogated on other grounds by State v. Silva*, 2019 UT 36, 456 P.3d 718. The particularity requirement mandates that "the terms of the warrant dictate the scope of the officers' authority." *Id.* (stating that "a warrant should leave nothing to the discretion of the officer executing it."); *cf. State v. Atkin*, 2003 UT App 359, ¶ 22, 80 P.3d 157 (describing the "particularity requirement" to require "that magistrates describe with specificity the items and places that can be searched under the auspices of a search warrant"). Indeed, "the Fourth Amendment confines an officer executing a search warrant strictly within the bounds set by the warrant." *Atkin*, 2003 UT App 359, ¶ 22 (cleaned up). Here, the warrant authorized officers only to "obtain" Allen's blood sample. It did not further extend officers' scope of authority to then test that blood as well.

¶51     The elements of the charged crime required the State to prove that Allen refused to submit to a chemical test "after a court ha[d] issued a warrant to draw and test the blood." Utah Code § 41-6a-520(7) (2021). Allen did indeed refuse to submit to a chemical test. But because the search warrant authorized only the "obtain[ing]" of Allen's blood and not the testing of it, the State failed to prove that Allen refused a test "after a court . . . issued a warrant to draw and test the blood." *Id.* Thus, the State failed to prove the elements of the charged crime.

¶52     Accordingly, the trial court erred when it implicitly denied Allen's motion to arrest judgment. Rule 23 states that a court,

upon a defendant's motion, "shall . . . arrest judgment if the facts proved or admitted do not constitute a public offense." Here, the facts proved do not constitute the public offense of refusal to submit to a chemical test. Accordingly, we vacate Allen's conviction for refusal to submit to a chemical test, and we remand this matter to the trial court for entry of acquittal on that count.

### III. Ineffective Assistance of Counsel

¶53    Finally, Allen asserts that Counsel rendered ineffective assistance at trial. To succeed on an ineffective assistance claim, Allen must make a two-part showing: (1) that Counsel's performance was deficient in that it "fell below an objective standard of reasonableness" and (2) that "there is a reasonable probability that, but for [C]ounsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984); *accord State v. Scott*, 2020 UT 13, ¶ 28, 462 P.3d 350; *State v. Ray*, 2020 UT 12, ¶ 24, 469 P.3d 871. Failure to prove either component is fatal to the claim; "[u]nless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687. Thus, "if either is lacking, the claim fails and this court need not address the other." *State v. Kufrin*, 2024 UT App 86, ¶ 55, 551 P.3d 416 (cleaned up).

¶54    In this case, Allen claims that Counsel rendered ineffective assistance in two different ways: (1) by not objecting to Officer's testimony about a "felony stop," and (2) by not requesting a clarifying jury instruction after presenting defense theories that Allen now claims are alternative and conflicting. For the reasons discussed, we reject each of Allen's ineffective assistance claims.

### A.    Officer's Testimony

¶55    First, Allen takes issue with Counsel's decision not to object to the back-and-forth between Officer and the prosecutor

about the traffic stop. The prosecutor asked Officer whether the traffic stop, executed after an eight-minute pursuit, was "a normal traffic stop" where officers "would approach, ask for license, that kind of thing." Officer responded with this statement:

> No. At this point, it's turned into what we call a felony stop. We train on it often. When they've committed a felony in our presence that we're aware of, it turns into we don't know what's going on, so our guns come out at this point with commands.

Counsel lodged no objection to this testimony. Allen now assails that decision as ineffective assistance, asserting that, by describing the stop as "a felony stop" and by implying that Allen had "committed a felony," Officer was offering an impermissible legal conclusion that not only encroached on the "province of the jury" but also unfairly informed the jury of the classification of the offense Allen was charged with. The State counters that Officer was simply offering context in an attempt to explain why the officers approached Allen with their firearms drawn and commanded him to get out of his car. And the State asserts that Counsel could reasonably have determined not to object to this testimony because objecting would have simply served to draw further attention to the mention of "felony." We agree with the State, and we conclude that Counsel did not perform deficiently in the manner in which he handled this testimony.

¶56 Rule 704(a) of the Utah Rules of Evidence provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue." "Nevertheless, opinions that tell the jury what result to reach or give legal conclusions continue to be impermissible under rule 704." *State v. Davis*, 2007 UT App 13, ¶ 15, 155 P.3d 909 (cleaned up). "This is because testimony that renders a legal conclusion tends to blur the separate and distinct responsibilities of the judge, jury, and witness, creating a danger that a juror may turn to the witness's legal conclusion rather than

the judge for guidance on the applicable law." *State v. Bowdrey*, 2024 UT App 113, ¶ 22, 555 P.3d 367 (cleaned up), *cert. denied*, 561 P.3d 688 (Utah 2024). We have repeatedly stated that there is no "bright-line distinction" between permissible and impermissible legal conclusions, but "witnesses quite clearly provide impermissible legal conclusions when they tie their opinions to the requirements of Utah law." *State v. Zimpfer*, 2024 UT App 136, ¶ 36, 558 P.3d 111 (cleaned up). And relatedly, it is usually erroneous for a court to instruct a jury about the classification of an offense, because "the classification of an offense is directly tied to its punishment." *See State v. Cesspooch*, 2024 UT App 15, ¶¶ 12–13, 544 P.3d 1046.

¶57 Allen's claim that Counsel should have objected to Officer's testimony—specifically to the use of the word "felony"—fails because it was objectively reasonable for Counsel to believe that Officer was simply giving context to the video the jury was about to see, rather than "embracing the ultimate issue in such a way that he gave legal conclusions or told the jury what result to reach." *Bowdrey*, 2024 UT App 113, ¶ 23 (cleaned up). Indeed, Officer explained that during "felony stop[s]," officers will brandish their weapons and yell commands during the stop. To be sure, Officer probably shouldn't have used the word "felony" in explaining why officers acted so aggressively in arresting Allen. But in this situation, Counsel could not have anticipated in advance that Officer would use that term; the question posed simply asked if the traffic stop had been a "normal" one in which officers "would approach, ask for license, that kind of thing." The question was not objectionable, and Counsel could not, by lodging an objection, have prevented Officer from making the statement about a "felony stop."

¶58 In a situation like this, where the potentially objectionable testimony comes in unsolicited, attorneys have a less-than-appealing palette of options. They can choose to refrain from objecting and to perhaps subtly clarify the issue later during cross-

examination. Or they can object to the testimony, move to strike it, and ask for a curative instruction. *See, e.g.*, *State v. Cortez-Izarraraz*, 2025 UT App 116, ¶¶ 37–38, 575 P.3d 1240. But moving to strike testimony and dealing with the situation through a curative instruction can "invoke the pink-elephant paradox: by being told *not* to think about a thing, jurors may actually be more likely to think about that thing." *State v. King*, 2024 UT App 151, ¶ 33, 559 P.3d 96; *see also State v. Popp*, 2019 UT App 173, ¶ 50, 453 P.3d 657 ("[A] curative instruction may actually serve to draw the jury's attention toward the subject matter of the instruction and further emphasize the issue the instruction is attempting to cure."). In situations like this one, an attorney usually does not perform deficiently by opting not to seek a curative instruction.

¶59　In this case, Counsel acted reasonably in choosing to forgo an objection to Officer's testimony about the traffic stop. Counsel could have reasonably believed that the testimony was simply being used to explain to the jury the aggressive-sounding actions officers took during Allen's arrest. And objecting and seeking a curative instruction would have served to further emphasize the mention of "felony" to the jury, which could have negatively affected Allen's defense. Thus, Allen has failed to demonstrate that Counsel performed deficiently by opting not to object. On this basis, we reject Allen's first claim of ineffective assistance.

B.　　Defense Theories

¶60　In his second ineffective assistance claim, Allen argues that Counsel was ineffective when he failed to request a clarifying jury instruction after presenting defense theories that Allen now describes as being inconsistent with each other. The State pushes back, arguing that Counsel's differing defense theories were not contradictory at all but, instead, worked together to form a "staggered" and layered defense strategy, and that in such a situation no clarifying jury instruction was necessary. Once again, we agree with the State.

¶61 At trial, Counsel focused on two different defense theories. Allen describes them like this: "(1) the State presented insufficient evidence that [Allen] possessed the requisite mens rea under [Section 210] to *knowingly* receive the visual or audible signal; [and] (2) the State proffered insufficient evidence that [Allen] possessed the required mens rea under [Section 210] to *intentionally* attempt to flee or elude law enforcement." Counsel asked questions of witnesses in an effort to develop these theories, and he emphasized both of them during closing argument. *See supra* ¶¶ 9, 13.

¶62 We agree with the State that, although the two defense theories are different, they do not necessarily contradict one another. In order to convict Allen on the failure to respond count, the State had to prove both that Allen knowingly received a "signal from a law enforcement officer to bring the vehicle to a stop," and that Allen (a) "operate[d] the vehicle in willful or wanton disregard of the signal so as to interfere with or endanger the operation of any vehicle or person" or (b) intentionally "attempt[ed] to flee or elude a law enforcement officer." Utah Code § 41-6a-210 (2021). Asserting at different times during a trial that the State has failed to prove different elements of the charged crime is not necessarily inconsistent or contradictory; it's just part of putting the State through its paces.

¶63 Under the circumstances presented here, it was not unreasonable for Counsel to choose to run two layered and potentially alternative defenses. *See State v. Barela*, 2015 UT 22, ¶ 23, 349 P.3d 676 (stating that "counsel could legally have presented alternative theories to the jury"). And it was not unreasonable for Counsel to believe that jurors didn't need a special instruction to help them understand the way those two defenses worked together. *See King*, 2024 UT App 151, ¶ 34 (stating that where "there was little, if anything, to be gained" by making the request, counsel "could reasonably have decided not to bother"). Thus, Allen has failed to show that Counsel's

performance "fell below an objective standard of reasonableness." *State v. Scott*, 2020 UT 13, ¶ 31, 462 P.3d 350 (cleaned up). Accordingly, we reject Allen's second ineffective assistance claim.

## CONCLUSION

¶64 We discern no reversible error in the trial court's decision not to give a lesser-included-offense instruction regarding Section 209. And Allen has not demonstrated that Counsel rendered ineffective assistance. Thus, we affirm Allen's conviction for failure to respond to an officer's signal to stop.

¶65 However, we find merit in Allen's arguments on the other count—the search warrant in question did not authorize officers to "draw and test" Allen's blood, and therefore the State failed to prove the required elements of the refusal to submit count. The trial court thus erred by not granting Allen's motion to arrest judgment. Accordingly, we vacate Allen's conviction for refusal to submit to a chemical test, and we remand this case to the trial court for the entry of an acquittal on that count.

––––––––––